# IN THE SUPREME COURT OF TEXAS

No. 18-1211

INNOVATIVE BLOCK OF SOUTH TEXAS, LTD., PETITIONER

V.

VALLEY BUILDERS SUPPLY, INC. D/B/A VALLEY BLOCK & BRICK, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

**Argued April 8, 2020**

JUSTICE DEVINE delivered the opinion of the Court.

The common law recognizes the value of a business's reputation and the value of its commercial relations. It protects the former through actions for defamation and the latter through actions for business disparagement. In this case, the corporate plaintiff sued a former business competitor, alleging that the competitor's disparaging remarks about the plaintiff's products contributed to its financial demise. The plaintiff's pleading asserted claims for defamation, slander per se, and business disparagement, but the plaintiff elected to submit only the defamation claims to the jury. The jury returned a defamation verdict in the plaintiff's favor, awarding general damages for the plaintiff's reputational injury and special damages for a related pecuniary loss. The trial court rendered judgment on that verdict, and the court of

appeals affirmed it, concluding the evidence sufficient to support the jury's award of general and special damages. 592 S.W.3d 147 (Tex. App.—Corpus Christi–Edinburg 2018).

Because the harm in this case relates solely to the plaintiff's commercial interests and the falsehoods disparage only the quality of the plaintiff's products and not the character of its business, we conclude that this is not a case of defamation but rather of business disparagement—a cause of action not submitted to the jury. We further conclude that there is no evidence for either the award of general damages for the plaintiff's reputation or the award of special damages connected to one of the allegedly defamatory remarks. We accordingly reverse the judgment of the court of appeals affirming the award of compensatory damages and render judgment for the defendant.

**I**

This case involves two building-supply companies, Valley Builders Supply, Inc., and Innovative Block of South Texas, Ltd. Both companies manufacture and sell concrete blocks and pavers to the same customer base in the Rio Grande Valley of South Texas. Valley began its business in the Rio Grande Valley in 1940. Valley had this market to itself for over sixty years. Domestic competitors were distant and transportation costs gave Valley a distinct competitive advantage. Innovative entered the market late in 2006, however, with a new concrete plant in La Feria. From that time, Valley and Innovative directly competed for customers until Valley ceased operations in 2010.

2

According to Valley, Innovative bears much of the blame for Valley's demise because of its false and disparaging remarks regarding the quality of Valley's products. Describing Innovative's sales tactics as unfair and illegal, Valley sued for damages under theories of business disparagement and defamation. Valley's pleadings asserted that Innovative disparaged the quality of Valley's concrete blocks by falsely accusing Valley of using "bad" aggregates in its manufacturing process. Because aggregates such as sand, gravel, or crushed stone account for over sixty percent of a concrete block's volume, the quality of aggregates strongly influences the quality of a block.

Valley's pleadings enumerated claims for business disparagement, defamation, and slander per se under three counts. Under the business-disparagement count, Valley asserted that Innovative's misrepresentations about the quality of its aggregate and its products caused Valley's business failure. Valley alleged that Innovative intended to interfere with Valley's economic interests, that Innovative's disparagements were malicious because Innovative knew them to be false, and that Innovative's actions caused it general and special damages reflected in the steady decline of its sales and the specific loss of one customer's business. Under the defamation count, Valley incorporated all of the preceding allegations, additionally asserting that the statements about the low quality of its products were also defamatory and actionable per se because they injured Valley in its profession or occupation. Finally, Valley asked for the award of its actual damages, including lost benefits of prospective contracts, lost profits, injury to reputation, lost sales, and loss of business.

3

At trial, Valley presented evidence of four instances in which Innovative's representatives disparaged the quality of Valley's concrete blocks.

*Statement One: "That is what their block looked like[,] and they're making an inferior block."*

The first of these statements was made to Stephen Stange. Stange was not a concrete-block customer. He was instead in the business of selling materials to concrete plants. Stange met with Ryan Murphy, an Innovative representative, to gauge Innovative's interest in purchasing aggregate and other materials from his employer. During their meeting, Murphy showed Stange a picture of Valley's "cull" pile and said, "[T]his is the kind of quality our competition is making." Stange, however, was familiar with Valley's plant because Valley was one of his customers. He immediately recognized the photograph to be of Valley's culls—defective blocks that failed to meet quality standards—and corrected Murphy. Later, another Innovative representative, John Sanchez, showed Stange the same picture and parroted Murphy's remark, suggesting that Valley was making an "inferior block." Again, Stange did not believe the statement and communicated that to Sanchez. Murphy left Innovative not long after his meeting with Stange, but Sanchez remained with Innovative as its sales manager until he was terminated in October 2009.

*Statement Two: "Valley was producing bad product[,] and they used bad materials."*

Sanchez was a key witness for Valley. He testified that Innovative's president, David Riegert, was "on a mission" to put Valley out of business—so much

4

so that he advised Innovative's sales team to tell customers that Valley's product was inferior and that Valley used bad aggregate to manufacture its blocks. Sanchez came to disagree with these tactics, going so far as to admonish Riegert in an email that Innovative should exercise more care in what it said about Valley's products:

> [An Innovative salesperson] told a customer that Valley Block was using bad product and that they use bad materials. [Another salesperson] told them that they were using bad materials. We cannot be telling customers that Valley Block uses bad materials. We don't know if they do[,] but we need to be careful.

Sanchez could not remember the name of the customer to whom these disparaging remarks were made.

*Statement Three: "Valley Block uses low[-]quality aggregates to manufacture pavers."*

Sanchez further testified that Riegert's misleading sales tactics continued in his correspondence to customers. In responding to a customer complaint concerning the quality of Innovative's pavers, Riegert gratuitously accused Valley and another competitor of using low-quality materials:

> Thank you for your telephone call regarding your recent purchase of pavers for your TXDOT project on 1 Mile East in Mercedes, TX. We are sorry to hear that the pavers lacked the quality you have come to expect from us. We strive to use better aggregates since our competition such as Pavestone and Valley Block use low quality aggregates to manufacture pavers.

According to Sanchez, Innovative "did not have a clue" as to whether Valley was actually using low-quality aggregates at the time Riegert sent the letter.

*Statement Four: "Valley Block received a load of bad aggregate."*

The fourth and final statement was made to Cynthia Hinojosa, a Valley

5

customer and co-owner of J&C Ram Masonry. Hinojosa testified that, although she could not remember who, an Innovative representative once told her that Valley had gotten "a load of bad aggregate." Believing that she could not risk buying from Valley because of the purported bad load, Hinojosa switched her business from Valley to Innovative for a particular project. After that project, Hinojosa attempted to return her business to Valley, but due to scheduling issues, she had to continue buying from Innovative.

Valley presented two experts at trial to quantify the damages it sustained from Innovative's allegedly disparaging and defamatory statements. Ignacio Garza, a certified public accountant, was asked to calculate the profits Valley lost as a result of Innovative's statement to Hinojosa about Valley's "load of bad aggregate." Because Hinojosa's company never again purchased from Valley following Innovative's "bad aggregate" comment, Garza used Innovative's gross sales to Hinojosa's company as the basis for calculating Valley's loss. He broke down those sales by year, multiplying annual sales by what he estimated to be Valley's profit margin for those years. After doing the math, he concluded that Valley would have recorded a profit of $93,528, had Hinojosa not switched her business to Innovative.

Dr. Kenneth Lehrer, a forensic economist, was the next expert to testify on Valley's behalf. Lehrer was asked to "estimate, as best as possible, the general damages that came about to Valley . . . by the loss of reputation through the statements of others." To provide that estimate, Lehrer turned to a statistical analysis of Valley's business losses over what he deemed to be the relevant period,

6

analyzing those losses under what he described as the Quasi-Monte Carlo methodology. This methodology involved selecting random variables and averaging out projected losses to produce a range of business losses Valley may have sustained from 2007 to 2015. Lehrer ultimately concluded that Valley's total losses attributable to the defamatory statements were somewhere between $1.5 and $1.66 million.

At the conclusion of Valley's case, Innovative moved for a directed verdict on the defamation claim, arguing that Valley's allegations and evidence supported, at best, only a claim of business disparagement. The trial court denied the motion. At the subsequent charge conference, the parties again argued the distinction between defamation and disparagement—that is, the legal difference between defaming a business's reputation, on the one hand, and disparaging the business's products or services on the other. Innovative objected to the submission of the defamation charge, offering business disparagement as the appropriate charge. Valley, however, elected to submit its case as defamation, and the trial court denied Innovative's objections.

The jury returned a verdict for Valley, finding each of the four statements defamatory and awarding general damages of $1.8 million for Valley's reputational injury and special damages of $93,528 for its lost profits. The jury also awarded $10 million in exemplary damages. Innovative moved for judgment notwithstanding the verdict, while Valley moved the court to accept the jury's verdict. The trial court denied Innovative's motion, granted Valley's, and rendered judgment on the verdict,

awarding Valley $1,803,528 in compensatory damages[1] and $937,056 in exemplary damages.[2]

Innovative later settled the exemplary-damages award but appealed the compensatory-damages award, which the court of appeals affirmed. 592 S.W.3d at 164. The appellate court concluded that the statements at issue were defamatory and that the expert testimony was reliable and sufficient to sustain the damages. Innovative appealed, and we granted its petition for review.

## II

Innovative argues again that the communications at issue are not actionable as defamation because they do not defame Valley itself but rather only disparage Valley's products. Innovative submits that Valley's complaint amounts to, at most, business disparagement because Valley's suit is based on an economic injury to its business rather than an injury to its reputation. Tellingly, Innovative argues that Valley's damages model was predicated entirely on pecuniary loss—the lost profits occasioned by Innovative's product disparagement—which is the hallmark of a business-disparagement claim.

Valley responds that Innovative's disparaging remarks portrayed it as an incompetent concrete-block producer and were thus defamatory per se because the communications reflected adversely on Valley's fitness to conduct its business. At the

---

[1] The compensatory-damage award represented $1.8 million in reputational damages plus $93,528 in lost profits, less a $90,000 settlement credit.

[2] The exemplary-damage award was capped at two times the amount of lost profits plus $750,000. *See* TEX. CIV. PRAC. & REM. CODE § 41.008(b).

very least, Valley submits that Innovative's disparaging remarks and false depiction of Valley's cull pile were reasonably capable of having a defamatory meaning.

The threshold issue, then, is whether Valley's allegations and proof in this case support an action for defamation, business disparagement, or both. The torts of defamation and business disparagement are alike in that "both involve harm from the publication of false information." *In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015). But there are important differences between the two, largely explained by the interests the respective torts seek to protect. *Id.* Defamation serves to protect one's interest in character and reputation, whereas disparagement protects economic interests by providing a remedy for pecuniary losses from slurs affecting the marketability of goods and services. *Id.*

The different interests each tort protects are reflected in their respective elements. To state a defamation claim, a plaintiff must show (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, at least amounting to negligence, and (4) damages, in some cases. *Id.* at 593. A defamatory statement is one that "tends [] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." RESTATEMENT (SECOND) OF TORTS § 559 (AM. L. INST. 1977); *see also Hancock v. Variyam*, 400 S.W.3d 59, 63 (Tex. 2013) (defining defamation "as the invasion of a person's interest in her reputation and good name").

In contrast, the tort of business disparagement encompasses falsehoods

concerning the condition or quality of a business's products or services that are intended to, and do in fact, cause financial harm. *See* RESTATEMENT (SECOND) OF TORTS § 629. Its elements are more stringent than those of defamation because business disparagement protects against pecuniary loss. *Hurlbut v. Gulf Atl. Life Ins.*, 749 S.W.2d 762, 766 (Tex. 1987). The publication of a disparaging statement concerning the product of another is actionable when (1) the statement is false, (2) published with malice, (3) with the intent that the publication cause pecuniary loss or the reasonable recognition that it will, and (4) pecuniary loss does in fact result. *See Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003) (listing elements as the publication of false and disparaging information with malice, and without privilege, causing special damages). The Restatement identifies proof of falsity, fault, and damages as points of distinction between the two actions.[3] *See* RESTATEMENT (SECOND) OF TORTS § 623A cmt. g.

Comparing their respective elements reveals where the torts differ: Defamation "seeks to protect reputation interests," whereas business disparagement "seeks to protect economic interests against pecuniary loss." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 155 (Tex. 2014). Because business disparagement, unlike defamation, is solely concerned with economic harm, proof of special damages is a "fundamental element of the tort." *Id.* That special

---

[3] For example, in business disparagement the plaintiff must prove the defendant's statement false, whereas in defamation the defendant bears the burden of proving truth. In business disparagement, the plaintiff must always prove malice, whereas in defamation mere negligence is sufficient in some cases. Finally, in disparagement only special damages can be recovered for actual pecuniary loss, whereas in defamation per se the existence of an injury to reputation is presumed and no actual financial damage need be proved.

damages are fundamental to business disparagement makes a plaintiff's injury a useful proxy for determining when the tort is actionable. Thus, if the gravamen of the plaintiff's claim is for special damages (e.g., an economic injury to the plaintiff's business), rather than general damages to its reputation, then the proper cause of action may be for business disparagement.

Yet the nature of a plaintiff's injury is no more than a proxy. Even though defamation's principal purpose is to provide a remedy for reputational harm (a noneconomic injury), plaintiffs may nevertheless recover special damages as well. *Lipsky*, 460 S.W.3d at 593. The torts thus overlap to the extent that both permit plaintiffs to recover for pecuniary loss. *See id.* Where the torts meaningfully diverge, then, is not in the nature of the injury but instead in the nature of the alleged falsehoods. This is consistent with the understanding that defamation redresses dignitary harm, while business disparagement redresses commercial harm. *Id.* at 591. Dignitary harm and commercial harm are not the same, of course, which is why "[i]mpugning one's reputation is possible without disparaging its commercial interests and vice versa." *Id.*

### III

Although Valley asserted claims for both business disparagement and defamation, it submitted only the defamation claim to the jury. Innovative objected and moved for a directed verdict as to that claim, asserting that there was no evidence of harm to Valley's reputation. The trial court denied the motion and submitted Valley's requested defamation charge. Valley maintains that defamation was the

11

correct charge because Innovative's disparaging comments about the quality of its products were defamatory per se and that its false statement about a bad load of aggregate was defamatory per quod.

Defamation claims are of two types, per se and per quod. *Hancock*, 400 S.W.3d at 64. When defamation is per se, the communication is actionable in and of itself without proof of actual damages. *Lipsky*, 460 S.W.3d at 593. A statement is defamatory per se when it falls within one of the categories that the common law considers so obviously harmful to reputation that the jury may presume the existence of general damages. *Id.* General damages are awarded for noneconomic harm, such as the embarrassment, humiliation, or loss of respect caused by the defamatory publication. *Id.* Defamation per quod, on the other hand, is "[d]efamation that either (1) is not apparent but is proved by extrinsic evidence showing its injurious meaning, or (2) is apparent but not a statement that is actionable per se." BLACK'S LAW DICTIONARY 526 (11th ed. 2019); *see also Hancock*, 400 S.W.3d at 63–64 (discussing the distinction between per quod and per se). Defamation per quod is actionable on allegations and proof of special damages. *See Waste Mgmt. of Tex.,* 434 S.W.3d at 160 (upholding awards of special and exemplary damages while holding evidence of general damages to reputation legally insufficient); *Hancock*, 400 S.W.3d at 71 (observing that special damages such as the loss of a business referral might support a defamation claim upon proof). Special damages are never presumed because they represent the specific pecuniary harm caused by the defamatory statement. *Lipsky*, 460 S.W.3d at 593. Defamation per se and per quod are not separate causes of action.

The distinction between them rests on a rule of evidence, and their difference lies in the proof necessary to establish an injury. *See Arant v. Jaffe*, 436 S.W.2d 169, 176 (Tex. App.—Dallas 1968, no writ).

Whether a communication is defamatory is in the first instance a legal question for the court. *Hancock*, 400 S.W.3d at 66. A statement is defamatory only if it is reasonably capable of a defamatory meaning. *Id.* (citing *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987); *see also* RESTATEMENT (SECOND) OF TORTS § 614, cmt. b (noting that it is for the court to decide "whether the communication was reasonably capable of conveying the particular meaning, or innuendo, ascribed to it by the plaintiff" and "whether that meaning is defamatory in character"). A defamatory statement is a statement of fact about a person that tends to diminish the plaintiff's reputation. *See Hancock*, 400 S.W.3d at 63.

Defamation law also extends to corporations. It is "well settled that corporations, like people, have reputations and may recover for harm inflicted on them." *Waste Mgmt. of Tex.,* 434 S.W.3d at 149. Even so, a corporation has no reputation in the personal sense of an individual. It does, however, have standing in the industry in which it operates and thus may sue for defamatory statements directed at its professional reputation and practices. *See* W. PAGE KEETON, ET. AL., PROSSER & KEETON ON THE LAW OF TORTS § 111, at 779 (5th ed. 1984).

The four statements about which Valley complains concern Valley's product. In these communications, Innovative refers to Valley's concrete blocks and aggregate as "inferior," "bad," and "low quality." Innovative maintains that these statements are not

13

actionable as defamation because they do not defame Valley itself but rather only disparage Valley's products. Valley responds that the remarks portray it as an incompetent concrete-block producer and are thus defamatory per se because they reflect adversely on Valley's fitness to conduct its business, one of the categories of defamation the common law views as so obviously hurtful to reputation that general damages are presumed.

While the torts of defamation and disparagement protect different interests, they may overlap in some fact situations, "particularly in cases of disparagement of the plaintiff's business or product." RESTATEMENT (SECOND) OF TORTS § 623A, cmt. g. Our decision in *Lipsky* acknowledges that the torts are not mutually exclusive, observing that "a plaintiff may have a claim for defamation, or for business disparagement, or both." *Lipsky*, 460 S.W.3d at 591. In that opinion, we included examples of business disparagement that were not strictly speaking defamatory, including one quite similar to the statements in this case—a publication "that says the plaintiff's wood products are inferior and will not stand up." *Id.* at 591 n.10 (quoting 3 DAN B. DOBBS, ET AL., THE LAW OF TORTS § 656, at 618–19 (2d ed. 2011)). The Restatement explains that although it may be possible to imply incompetence in nearly every case in which the quality of a business's product is disparaged, something more direct may be required to impugn a business's reputation. RESTATEMENT (SECOND) OF TORTS § 623A, cmt. g. One court, after conducting an early survey of similar cases, explained the relationship between defamation and comments regarding a business's products:

> [W]here the publication on its face is directed against the goods or product of a corporate vendor or manufacturer, it will not be held libelous per se as to the corporation, unless by fair construction and without the aid of extrinsic evidence it imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct in its business in relation to said goods or product.

*Nat'l Ref. Co. v. Benzo Gas Motor Fuel Co.*, 20 F.2d 763, 771 (8th Cir.), cert. denied, 275 U.S. 570 (1927).

Our cases make a similar point by emphasizing that defamatory communications about a corporation's reputation are those directed at the character of the owner rather than the underlying business. *See Waste Mgmt.*, 434 S.W.3d at 150 n.35 (citing cases). And we are in accord with those cases and commentaries that require a fair imputation of corporate dishonesty or other reprehensible conduct in connection with the disparaged goods and services to sustain a separate claim for defamation per se. *See, e.g., Lipsky*, 460 S.W.3d at 594–95 (sustaining a natural-gas company's defamation action after the defendant falsely accused the company of contaminating an aquifer during fracking operations); *Waste Mgmt.*, 434 S.W.3d at 147, 156–62 (sustaining a waste-disposal company's defamation action after the defendant falsely accused the company of evading environmental rules and ignoring sound environmental practices); *Bell Publ'g Co. v. Garrett Eng'g Co.*, 170 S.W.2d 197, 199–201, 207 (Tex. 1943) (sustaining engineering firm's defamation action after defendant falsely stated that no one in the firm held an engineering degree). Because the disparaging remarks about the quality of Valley's products do not necessarily impugn Valley's character or reputation, Innovative's alleged statements are not defamatory per se and general damages are therefore not presumed.

15

## IV

But even though reputational harm is not presumed here, Valley may nevertheless be entitled to general damages if there is evidence of an actual injury to its reputation. The jury found such an injury, awarding $1.8 million for the harm to Valley's reputation caused by Innovative's remarks about its products. The only evidence supporting that award is the testimony of Dr. Kenneth Lehrer. Lehrer's testimony focused on the Quasi-Monte Carlo methodology, which he used to quantify the possible harm done to Valley's reputation as a percentage of Valley's business losses during the years it competed with Innovative.

The trial court conducted a *Daubert* hearing in which Lehrer testified about the basis of his opinion and methodology. *See Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993). Lehrer first testified about the original Monte Carlo method, which in broad strokes is "doing something millions of times to come up with the most probable outcome." Monte Carlo simulations are used to predict a range of values when a precise value is difficult to calculate. The method, as explained to the court, essentially requires a computer to run millions of possible, randomized scenarios to produce a range of likely values for the number in question. For example, the method may be used to estimate the number, intensity, and location of all forest fires in the United States in a given year. A Monte Carlo analysis of the question would require inputting massive amounts of data from previous forest fires into a computer, and the computer would produce a range of the most likely scenarios.

Lehrer testified that smaller questions—for example, whether a forest fire will

16

happen within a particular county—may be answered using the "Quasi-Monte Carlo" method. Unlike the Monte Carlo method, the Quasi-Monte Carlo method uses a smaller data set to answer a smaller question. Lehrer purported to use the Quasi-Monte Carlo method to calculate a range of possible damages resulting from Innovative's defamatory statements. But instead of running the scenario millions of times, as in a full Monte Carlo analysis, Lehrer ran the scenario twice.[4]

Lehrer began with $5.135 million, the amount he estimated to be Valley's lost profits over the years in question. To calculate the percentage of those losses attributable to Innovative's statements, Lehrer created two estimates—one on the "high end" and one on the "low end." Each estimate included four scenarios. On the low end, he hypothesized that the alleged statements caused 15, 20, 35, or 50 percent of Valley's losses. On the high end, he randomly substituted 15, 20, 40, and 60 percent. Lehrer acknowledged at trial that these numbers had no basis in any underlying data from the case. Lehrer then multiplied those percentages in the low and high end by Valley's total losses—$5.153 million—to produce eight different dollar amounts as depicted below:

Low-End Estimate

|  | Percentage of total losses attributable to the alleged defamation | Total losses | Dollar amount of losses attributable to the alleged defamation |
|---|---|---|---|
| Scenario A | 15% | $5,153,000 | $772,950 |

_____

[4] The court of appeals noted that Lehrer's analysis "appears to be more akin to a simple weighted average than a Monte Carlo-type study." 592 S.W.3d at 162.

| | | | |
|---|---|---|---|
| Scenario B | 20% | $5,153,000 | $1,030,600 |
| Scenario C | 35% | $5,153,000 | $1,803,550 |
| Scenario D | 50% | $5,153,000 | $2,576,500 |

High-End Estimate

| | Percentage of total losses attributable to the alleged defamation | Total losses | Dollar amount of losses attributable to the alleged defamation |
|---|---|---|---|
| Scenario A | 15% | $5,153,000 | $772,950 |
| Scenario B | 20% | $5,153,000 | $1,030,600 |
| Scenario C | 40% | $5,153,000 | $2,061,200 |
| Scenario D | 60% | $5,153,000 | $3,091,800 |

Lehrer next assigned a random percentage of probability to each of the eight dollar amounts, totaling 100% for each of the two ranges. He acknowledged that these percentages also were not derived from any data or evidence in the case. Lehrer then multiplied the eight sums determined in the tables above by these randomly selected percentages to yield a range of possible losses he attributed to the defamatory statements. These calculations are depicted in the tables below:

Low-End Estimate

| | Dollar amount of losses attributable to the alleged defamation | Percentage likelihood of each scenario | Defamation losses multiplied by percentage likelihood |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Scenario A | $772,950 | 20% | $154,590 |
| Scenario B | $1,030,600 | 32% | $329,792 |
| Scenario C | $1,803,550 | 30% | $541,065 |
| Scenario D | $2,576,500 | 18% | $463,770 |
| Sum: | | | $1,489,217 |
| Low-End Estimate (rounded up): | | | $1,500,000 |

## High-End Estimate

| | Dollar amount of losses attributable to the alleged defamation | Percentage likelihood of each scenario | Defamation losses multiplied by percentage likelihood |
|---|---|---|---|
| Scenario A | $772,950 | 20% | $154,590 |
| Scenario B | $1,030,600 | 32% | $329,792 |
| Scenario C | $2,061,200 | 30% | $618,360 |
| Scenario D | $3,091,800 | 18% | $556,524 |
| Sum: | | | $1,659,266 |
| High-End Estimate (rounded up): | | | $1,660,000 |

After totaling the low-end and high-end estimates respectively, Lehrer concluded that Innovative's allegedly defamatory statements caused Valley somewhere between $1.5 and $1.66 million in business losses.[5]

---

[5] Notably, the jury went above the high end of Lehrer's range in awarding $1.8 million in reputational damages. But as the court of appeals noted, $1.8 is less than the maximum amount of damages that Lehrer's model produced (60% of $5.1 million, or $3,091,800). *See* 592 S.W.3d at 163.

"Qualified experts may offer opinion testimony if that testimony is both relevant and based on a reliable foundation." *Gharda USA, Inc. v. Control Sols, Inc.*, 464 S.W.3d 338, 348 (Tex. 2015). Expert testimony is relevant if it is "sufficiently tied to the facts of the case" such that it will "aid the jury in resolving a factual dispute." *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995) (citations and quotations omitted). Expert testimony is reliable if it meets the six non-exclusive *Robinson* factors, *see id.* at 557, or if the trial court can otherwise assess its reliability, *see Helena Chemical Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). But "[i]f an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable." *Helena Chem. Co.*, 47 S.W.3d at 499. We review the trial court's decision to admit expert testimony for abuse of discretion. *Id.*

Innovative objected to the admission of Lehrer's testimony at trial as being based on unreliable data and consisting of nothing more than the *ipse dixit* of a credentialed witness. Innovative renews that argument here. Reputational damages are not amenable to exact calculation, so the factfinder must use "sound judgment" in determining the amount of such damages. *Waste Mgmt.*, 434 S.W.3d at 154. Sound judgment begins with the facts of the case, however, and Lehrer's expert testimony is largely unmoored from those facts.

Lehrer began with Valley's estimated total lost profits of $5.135 million, which Innovative does not directly challenge.[6] However, the percentages of the $5.135

---

[6] The $5.135 million figure, representing Valley's total losses from 2007 to 2015, is based in part on Valley's income tax returns. Because Valley went out of business in 2010 and did not file returns after that year, Lehrer projected Valley's losses for these succeeding years.

million that Innovative's statements may have caused—the low-range (15/20/35/50) and the high-range (15/20/40/60) percentage sets—have no basis in any evidence. Lehrer simply made those numbers up, or consistent with his methodology, selected them randomly. Lehrer similarly assigned random percentages of probability to each of the eight numbers in the percentage sets. In a full Monte Carlo study, randomly chosen scenarios are run millions of times to produce a useful approximation of an event. In contrast, Lehrer's calculation consisted of only eight scenarios. Moreover, while Lehrer emphasized that he considered other causes,[7] he provided no basis for his model's parameters. Lehrer assumed (without evidence) that Innovative caused a minimum of 15% and a maximum of 60% of Valley's total lost profits. Because any amount of damages for defamation per quod must be supported by evidence, Lehrer's assumption was in error.[8] *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014). Further, Lehrer did not limit his calculations to any specific defamatory statement or tailor his analysis to the substance or audience of the statements. Thus, even if the "Quasi-Monte Carlo" theory is a valid way to calculate reputational damages (and we doubt it is), Lehrer's calculations were based on unreliable, irrelevant data that had little to do with the actual case that was tried. We accordingly agree with Innovative that Lehrer's opinion is based on "unreliable data" and should have been excluded by the trial court. *See Helena Chem. Co.*, 47

---

[7] Lehrer purported to consider other possible contributing factors for Valley's business decline, such as the weather, the recession and health of the economy, and competition.

[8] When asked about the rate of error for his analysis, Lehrer replied: "[E]conomics is an art and you can't test a rate of error on an art. Rates of error are for science. There is no . . . fundamental correct or benchmark answer for an art . . . . When Chairman Yellen raises interest rates, you can't go down there and grade her and tell her her rate of error, because it's unknown. It's an art."

S.W.3d at 499.

Beyond Lehrer's use of random numbers, there is also the matter of Lehrer's use of lost profits here to approximate Valley's reputational harm. Lost profits are special damages that must be specifically pleaded and proved. By contrast, harm to reputation is a noneconomic injury that may be presumed when the defamation is actionable per se but otherwise requires evidence of actual harm. Lehrer's testimony here conflates special and general damages by substituting hypothesized special damages as proof by proxy for Valley's general damages and noneconomic harm. We have previously declined similar proof.

For example, in *Burbage v. Burbage*, 447 S.W.3d at 253, a jury awarded a funeral home and its owner collectively over $3.5 million as general damages for loss of reputation via a defamation claim. The source of the defamation was a disgruntled family member who repeatedly defamed the owner, his brother, and disparaged the funeral home's services. The owner of the funeral home sought to substantiate the general-damages award with testimony that the value of the business, which he roughly estimated at $3 million, would likely be lost because of his brother's continuous attacks. *Id*. at 260. After discussing the speculative nature of this testimony, we concluded that "[t]he evidence does not show actual loss of reputation, that anyone believed the defamation, that the Burbage Funeral Home suffered an actual loss, or even the funeral home's actual value." *Id*. at 262. We noted further that the owner sought damages to the business rather than to the business's reputation, a "fine distinction [that] matters" because business disparagement was

22

the appropriate cause of action to protect the funeral's home's economic interests. *Id.* at 261 n.6. In any event, the economic damages had not been pleaded or proved as special damages in the defamation suit and were thus unavailable. *Id.*

Similarly, in *Waste Management*, 434 S.W.3d at 160, a waste-disposal company sought recovery for its reputational harm based on lost profits. The company's CEO valued the company's reputation at $10 million, and the jury valued the injury to it at half that, awarding $5 million for the harm. *Id.* The CEO's valuation of harm, however, rested largely on evidence of lost profits and unrelated business expenses. *Id.* We observed that "[t]hese special damages . . . are not the sort of general damages that necessarily flow from such a defamatory publication." *Id.* We noted further that exhibits concerning the alleged decrease in the company's "base business" were not evidence of actual injury to the company's reputation and were thus insufficient to quantify any amount of reputational damages. *Id.*

As these cases demonstrate, Lehrer's Quasi-Monte Carlo methodology and testimony is no evidence of any quantifiable harm to Valley's reputation, nor is it evidence of any special damages. Thus, even if this were defamation per se, as Valley contends, there would be no evidence of harm beyond the presumed nominal amount. Valley, however, alleged the loss of a specific customer's business—an allegation that may support an award of special damages. We consider that issue next.

## V

Valley alleged that representatives of Innovative falsely informed Cynthia Hinojosa of J&C Ram Masonry that Valley had received a "load of bad aggregate."

23

Although a longstanding Valley customer, Hinojosa knew that bad aggregate would affect the quality of Valley's product. According to Valley's pleadings, Hinojosa began buying block for the first time from Innovative after hearing this falsehood. Hinojosa confirmed at trial that she was indeed told about the bad aggregate and thereafter began buying Innovative's products. Ignacio Garza, Valley's expert witness on special damages, calculated the pecuniary loss to Valley caused by Innovative's disparaging remarks to Hinojosa. He began by determining Innovative's gross receipts from sales to Hinojosa's business. Garza multiplied that sum by what he calculated to be Valley's profit margins for the years in question, arriving at an amount he represented to be Valley's lost profits from that customer. The jury agreed with his math and awarded Valley $93,528 as the lost profits caused by Innovative's false statement about "a load of bad aggregate."

Innovative contends that these special damages were not recoverable as defamation because there is no evidence supporting the jury's finding that the statement on which they were based was defamatory. Citing *Lipsky*, Innovative submits that the special damages here might have been proper under a business-disparagement theory, but not under defamation. *See Lipsky,* 460 S.W.3d at 591 n.10. Valley responds that these special damages confirm its reputational harm, citing our recent decision in *Anderson v. Durant*, 550 S.W.3d 605 (Tex. 2018). In *Anderson*, we said: "Evidence that the plaintiff has lost a job or business opportunities may be evidence of loss of reputation, but only if it is connected to the defamatory statements." *Id.* at 621. Valley submits that such a connection exists here based on

Hinojosa's testimony that the statement about bad aggregate caused her switch to Innovative.

As previously discussed, the tort of defamation serves to protect a plaintiff's reputation, providing compensation where it has been harmed. That harm can be general or special, and the damages awarded are labeled similarly. General damages are awarded for the plaintiff's noneconomic injuries, such as the embarrassment, humiliation, anguish, or loss of respect caused by the defamation. Special damages, on the other hand, are for economic injuries and consist of the actual pecuniary losses that flow directly from the defamation.

Business disparagement is more limited. General damages are unavailable for business disparagement, while the existence and proof of special damages are required for the claim to succeed. Because special damages are an essential element of business disparagement but may also be available under defamation, the potential exists for the respective claims to overlap.

But as we have already determined, disparaging a plaintiff's goods or services is not defamatory per se because commercial disparagements do not necessarily impugn character or reputation. This distinction has long been observed: "[I]f the statement impugns the integrity or credit of a business, there is an action for defamation, but if merely the quality of a business' goods or services are criticized, only disparagement will lie." *Developments in the Law—Competitive Torts*, 77 HARV. L. REV. 888, 893 (1964). This line is not always clear, however, because almost every aspersion cast upon a business's goods and services may be thought to reflect upon

its integrity. But as a Restatement comment explains, only those statements in which the "imputation fairly implied is that the plaintiff is dishonest or lacking in integrity or that [it] is perpetrating a fraud upon the public by selling something that [it] knows to be defective amount to defamation." RESTATEMENT (SECOND) OF TORTS § 623A, cmt. g. Defamation in this context is thus defined by the nature of the falsehood rather than the nature of the damages.

Our caselaw provides, however, that the existence of special harm, such as the loss of a job or business opportunity, may also indicate the existence of reputational harm. *See Anderson*, 550 S.W.3d at 609 (examining economic consequences to plaintiff "falsely accused of taking illegal kickbacks on used car acquisitions"). Similarly, in *Hancock*, we intimated that special damages might serve to substantiate a loss of reputation. *Hancock*, 400 S.W.3d at 71. The statements in that case disparaged a physician's veracity and were contained in a letter sent by a colleague to other physicians. As in this case, we concluded that the statements were not defamatory per se. *Id.* at 68. Neither were they defamatory per quod because the statements did not cause any actual harm to the plaintiff's reputation. *Id.* The physician accused of being a liar, however, feared that the letter might cause other physicians not to send him referrals. If that were proved, we said, the physician would be entitled to special damages, which might substantiate a loss of reputation. *Id.* at 71. But because there was no evidence of any actual injury to the physician's reputation, we reversed the defamation judgment. *Id.* In *Waste Management*, there again was no evidence of general damages or any quantifiable injury to a

26

corporation's reputation, but we upheld an award of special damages because the pecuniary loss arose directly from efforts to rebut the defamation. *Waste Mgmt.*, 434 S.W.3d at 161. The defamation there concerned false accusations that a waste-disposal company was evading environmental rules and ignoring sound environmental practices in its business. *Id.* at 147.

These cases confirm that special damages alone are enough to support a defamation claim when sufficiently connected to a defamatory communication. But for that connection to matter, the communication must be defamatory, or at least capable of a defamatory meaning. In the cases discussed above, the alleged defamation expressed or implied some type of reprehensible conduct or character flaw, such as taking illegal kickbacks, lying and manipulating the truth, or polluting the environment. Thus, a statement that charges the plaintiff with personal misconduct, or imputes to the plaintiff reprehensible characteristics, is regarded as defamation, but aspersions that reflect only on the quality of the plaintiff's product or services is properly considered disparagement. PROSSER & KEETON ON THE LAW OF TORTS § 128, at 964–65 (5th ed. 1984).

Here, the statement allegedly causing the pecuniary loss is that Valley received a load of bad aggregate. The receipt of bad aggregate does not imply reprehensible conduct or a lack of integrity on Valley's part. Although criticisms concerning the quality of a business's goods or services may be actionable as commercial disparagement, they are not, without more, an indictment of the business's integrity or character. *See, e.g., Burbage*, 447 S.W.3d at 261 n. 6 (alluding

27

to the distinction as between that which injures the reputation of the business owner (defamation) and that which injures the business itself (disparagement)). We reiterate that the loss of a specific job, sale, or business opportunity because of falsehoods about the quality of a business's goods or services does not implicate the business's reputation unless such criticism fairly imputes dishonesty, a lack of integrity, or other reprehensible conduct. Such an imputation cannot be implied from the allegations and proof in this case. We therefore conclude that Innovative's objection to the defamation charge should have been sustained, and the case submitted under the more stringent elements of business disparagement.

\* \* \* \* \*

In sum, we conclude that disparaging the quality or condition of a business's product or service is not, standing alone, defamation per se. We conclude further that no evidence exists here to support an award of general damages for harm to Valley's reputation. Finally, we conclude that, because there is no evidence of an actual injury to reputation and the disparaging remarks are not otherwise capable of a defamatory meaning, the pecuniary loss for which special damages were sought may be cognizable as business disparagement but not as defamation. The judgment of the court of appeals is reversed and judgment rendered that Valley take nothing under its defamation claim for compensatory damages.

_____
John P. Devine
Justice

28

Opinion Delivered:  June 26, 2020